

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 21, 2025**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 19-40831-ELM |
| DENNIS WAYNE LINDEMAN AND | § | |
| DONNA ELIZABETH GORDON, | § | |
| | § | Chapter 7 |
| Debtors. | § | |
| | § | |
| MANSOOR S. NOORUDDIN, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 19-04064 |
| | § | |
| DENNIS WAYNE LINDEMAN, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

In this adversary proceeding, Plaintiff Mansoor S. Nooruddin ("**Nooruddin**") filed suit

against Defendant Dennis Wayne Lindeman ("**Lindeman**"), the Chapter 7 debtor in Case No. 19-

40831 (the "**Bankruptcy Case**"), to seek the denial of Lindeman's discharge pursuant to sections

727(a)(2) and 727(a)(4)(A) of the Bankruptcy Code, or the nondischargeability of the debt

allegedly owed to Nooruddin by Lindeman pursuant to sections 523(a)(2) and 523(a)(6) of the Bankruptcy Code. Because a judgment denying Lindeman a discharge has already been entered in another proceeding,[1] however, the discharge objection claims under section 727 are now moot. Additionally, because the denial of discharge also moots any request for nondischargeability under section 523, the section 523 claims, vis-à-vis seeking a determination of nondischargeability, are also moot.  Thus, the only issue that remains to be addressed in this case is the liquidation of the amount of the debt, if any, owed by Lindeman to Nooruddin.  As to that issue, pursuant to his Complaint, Nooruddin has asserted claims against Lindeman for (1) misuse of construction trust funds in violation of the Texas Deceptive Trade Practices Act; (2) common law fraud; (3) embezzlement; and (4) breach of a fiduciary duty.[2]  Lindeman timely filed an Answer in opposition to the Complaint, denying any liability.[3]

On April 20, 2023, the adversary proceeding came on for trial.  Nooruddin appeared pro se.  Neither Lindeman nor counsel for Lindeman appeared.  At the conclusion of the trial, the Court took the matter under advisement.  Having now considered the Complaint, the Answer, the evidence introduced at trial, and the representations and arguments of Nooruddin, the Court issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[4]

---

[1] *See* Adversary Proceeding No. 19-4103, Docket No. 54.

[2] Docket No. 1 (the "**Complaint**").

[3] *See* Docket No. 47 (the "**Answer**").

[4] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include any findings of fact, they should be deemed as such.

## *JURISDICTION*

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).  The Northern District of Texas is the proper venue under 28 U.S.C. § 1409.  The Court has the authority to enter a final judgment as the issue is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).

## *FACTUAL BACKGROUND*

On February 28, 2019 (the "**Petition Date**"), Lindeman and his wife, Donna Elizabeth Gordon ("**Gordon**" and together with Lindeman, the "**Debtors**"), filed their joint voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

### A.    *The Construction Contract*

Prior to the Petition Date, Lindeman made a living within the home construction/renovation industry.  On April 5, 2016, the Debtors organized Pinnacle Investment Properties, LLC ("**Pinnacle**") to facilitate Lindeman's work.[5]  At all relevant times, Lindeman was a managing member of Pinnacle.[6]

Separately, Nooruddin also had a connection with the home renovation world.  He planned to acquire and renovate rundown homes and then resell them at a profit.  In furtherance of such objective, in 2018, Nooruddin purchased a dilapidated property located at 5325 Cedar Springs Road, Dallas, Texas 75235 (the "**Property**") with the intention of either renovating and then flipping it for a profit, or potentially living in the house himself.

---

[5] *See* Pl.'s Exh. 3 (Certificate of Formation).

[6] *See id.*

Once Nooruddin had purchased the Property, he searched for a handyman or general contractor to rehabilitate the Property. During this search process, which included online website searches, Nooruddin found Lindeman. After discussing his goals for the Property and finding Lindeman to be very confident and credible, Nooruddin determined to engage Lindman to do the renovation work. Accordingly, on or about July 26, 2018, Nooruddin (as the "Client") and "Lindeman and/or Pinnacle" (as the "Contractor") entered into a Construction Contract, dated July 26, 2018 (the "**Construction Contract**").[7]

The Construction Contract, signed by both Nooruddin and Lindeman (in Lindeman's case, on behalf of himself and Pinnacle), outlined the services to be provided by the "Contractor." Specifically, the Construction Contract provided that the "Contractor" would complete renovations as needed to update the Property to "current market standards."[8] It was the parties' general understanding that "current market standards" meant that the Property would be habitable or sellable to a reasonable person and be up to code as required by the City of Dallas. Additionally, the Construction Contract provided that the services included "any other tasks which the Parties may agree upon."[9] Nooruddin and Lindeman agreed that the home renovations would be completed within eight weeks. [10]

The Construction Contract also included the payments to be made by Nooruddin.[11] The payment schedule provided for a total of $80,000 in payments to made, with installments in the following amounts to be paid on two-week intervals: [12] (i) a $20,000 deposit due upon execution

---

[7] *See* Pl.'s Exh. 1A (Construction Contract).

[8] *See id.* ¶ 1.

[9] *See id.* ¶ 2.

[10] *See id.* ¶ 11.

[11] *See id.* ¶¶ 7-9.

[12] *See id.* ¶ 7.

of the Construction Contract; (ii) followed by a payment of $20,000; (iii) followed by another payment of $20,000; (iv) followed by a payment of $10,000; and (v) then followed by a final payment of $10,000 that was to coincide with the completion of the project.[13]

In mid-July 2018, Nooruddin and Lindeman began to exchange text messages regarding the scope of work that would bring the Property up to "current market standards."[14]  During this exchange, Lindeman texted to Nooruddin detailed lists of the work to be completed at the Property. Nooruddin and Lindeman were in agreement as to the scope of work provided in these text messages.  Among other things, the texts included a detailed rehabilitation overview and details of the renovations to be completed on the exterior, interior, kitchen, and bathrooms.

The rehabilitation overview provided that Lindeman would repair the foundation; replace the fence; remove trees and debris around the house; update the electrical and plumbing systems; and install a new HVAC system.[15]

Regarding the exterior of the Property, Lindeman agreed that he would paint all exterior trim; replace the gutters; repair and mortar the walls as needed; repair the damaged wood on the house and garage; replace and stain the fence as needed; complete landscaping; install sod in the front and backyard; trim and mulch the flower beds; remove trees as needed; and remove the shed.[16]

For the interior, Lindeman agreed to remove all popcorn ceilings; paint all flat surfaces, trim, and doors; remove all flooring; replace all light fixtures; install recessed lighting in each room; install tile in bathrooms and laundry room; and install hardwood flooring throughout the

---

[13] *See id.* ¶¶ 8-9.

[14] *See* Pl.'s Exh. 2.

[15] *See id.*

[16] *See id.*

living, dining, and bedroom areas.[17]   In the kitchen, Lindeman agreed to install new cabinets,

hardware, countertops, backsplash, sink, gooseneck faucet, and disposal.[18]  The general scope of

work provided that Lindeman would patch all walls where needed; install drywall where needed;

replace all wall outlets; remove and replace doors with six panel doors; paint to match the trim;

install new hardware throughout; install new toilets in all bathrooms; install tile with 1/16" inch

spacing; open the kitchen wall to the living room; and replace all windows.[19]

## B.    *Renovation Process Begins; Problems Quickly Arise*

Nooruddin made the initial down payment required by the Construction Contract.[20]  Then

Renovations at the Property began the last week of July 2018.  For the balance of the payments

due under the Construction Agreement, Nooruddin obtained a construction loan from American

National Investors Corporation ("**American National**").[21]   In coordination with American

National, and as is customary under construction loans, Lindeman would periodically submit draw

requests directly to American National along with a verified statement of the work performed, and

then if everything was in order, American National would, at the direction of Nooruddin, advance

the requested loan proceeds directly to Lindeman's designee – Pinnacle.[22]

---

[17] *See id.*

[18] *See id.*

[19] *See id.*

[20] *See* Pl.'s Exh. 5A; Pl.'s Exh. 5B.  For the avoidance of confusion, Nooruddin also entered into a separate Joint Venture Agreement with Lindeman on or about July 24, 2018, under which Nooruddin agreed to make a payment of $10,000 in exchange for Lindeman's professional mentoring in relation to the home renovation and remodeling industry, including the provision of referrals as necessary to assist in the coordination of all construction activity involved in renovating and remodeling properties acquired by Nooruddin during the term of the Joint Venture Agreement.  *See* Pl.'s Exh. 1B (Joint Venture Agreement).  The Joint Venture Agreement is not at issue in this case, nor is the $10,000 payment that Nooruddin made to Lindeman under the terms of the Joint Venture Agreement.  Only the Construction Agreement is at issue in this case.

[21] *See* Pl.'s Exh. 5C-F.

[22] *See* Pl.'s Exh. 6.

This is the process that was followed over the span of multiple weeks. Eventually, however, once Nooruddin began to visit the Property to check on the progress of the renovations, he began to have concerns based upon the appearance of work not being completed.

### 1.   Withdrawals From the Construction Loan

Throughout the renovation process, Lindeman made four draw requests to American National. With each request, Lindeman included the amount needed and details of the work that allegedly been performed at the Property.[23]

The first draw request was made on August 11, 2018, for $20,000. Lindeman represented that he had performed foundation repairs; trimmed, cleared, and removed trees; performed interior demolition and framing; installed sheetrock, installed plumbing, electrical components, cabinets, vanities, sinks, tubs, showers, tile, faucets, mirrors, and flooring; conducted work on the garage; and installed ductwork and a furnace.[24]

Two weeks later, on August 28, 2018, Lindeman made his second draw request for $20,000. In that draw request, he stated that he had continued framing; moved and started the electrical panel; rewired the entire house; installed boxes; ran new plumbing and sewer lines; replaced flooring supports; replaced siding on garage; finished demolition on outside structures; removed gutters; and power washed, primed, and sealed the house and garage.[25] At this point, the first signs of concern began to become visible. Among other things, six different dumpsters had accumulated on site at the Property.[26] None of them had been removed because Lindeman had

---

[23] See id.

[24] See id.

[25] See id.

[26] See Pl.'s Exh. 14.

failed to pay an outstanding invoice of $1,250 to the dumpster contractor.  Ultimately, Nooruddin had to separately pay for it.

Two weeks after the second draw request, Lindeman made his third draw request for $20,000.  In that draw request, Lindeman claimed to have replaced the roof and decking for the house and garage; finished all rough electrical work and plumbing; installed an HVAC; readied the Property for inspections; started installation of drywall on the house and garage; completed the garage; installed the garage door; removed the concrete post and fence in the front yard; and started installation of the fencing.[27]

The last draw request for $20,000 was made on November 8, 2018.  In connection therewith, Lindeman certified that he had installed new windows; removed the sidewalks in the front and side yards; installed pavement for the parking area; built the fence for the front and backyards; constructed the porch deck for master bedroom; mortared and cemented the house; painted both the interior and exterior; applied sheetrock texture; continued work on electrical, plumbing, and framing modifications; obtained three additional dumpsters; and installed recessed lighting in all rooms.

Shortly after each draw request was made, the requests were honored and Lindeman was provided the funds requested funds.[28]  In total, Lindeman received $80,000 from the construction loan.[29]

### 2.    *Nooruddin Notices Little to No Progress at the Property*

Throughout the renovation process, Nooruddin would go to the Property to check on the progress.  Over time, he became more and more concerns and disturbed by the lack of progress

---

[27] *See* Pl.'s Exh. 6.

[28] *See* Pl.'s Exh. 5C-F.

[29] *See* Pl.'s Exh. 7; *see also* Pl.'s Exh. 9, at p. 2.

was being made at the Property, particularly in light of the increasing amount of draws that had been made and the certified details of the work that had allegedly been performed in support of obtaining each draw.

Due to his concern, Nooruddin began to frequently text and call Lindeman to ask, among other things, why portions of the renovation had not been completed and why there were never any workers at the Property.  Nooruddin frequently expressed concern that Lindeman was not following their eight-week timeline for completion of the renovations.  At first, Lindeman justified the lack of progress on weather conditions.  Lindeman then shifted the blame to the need for an inspection and the approval of plumbing work from the City of Dallas before continuing any interior renovations.[30]  As Nooruddin continued to inquire about the inspection, Lindeman became less and less responsive to his inquiries.  But when Lindeman would respond, he would simply blame the master plumber for not showing up for the scheduled inspections.  Once the plumbing was finally approved in early December 2018, Nooruddin expected the interior renovations to rapidly pick up speed. This did not occur.  Instead, the problems only persisted.

Between early December 2018 and February 2019, Nooruddin frequently checked in on the progress at the Property and questioned Lindeman on the progress being made.  Lindeman often did not respond to Nooruddin's texts, but when he did, he continuously presented an excuse for the completion deadline to be extended.  Eventually, Noorudin could not tolerate the lack of progress anymore.

### 3.    *Nooruddin Hires Counsel*

On January 9, 2019, after little progress had been made on the Property after an extended period of time and Lindeman had become unresponsive to phone calls and texts, Nooruddin sent

---

[30] *See* Pl.'s Exh. 18.

a Notice of Default and Demand to Cure to Lindeman (the "**Demand**").[31]  Pursuant to the Demand, Nooruddin put Lindeman on notice of the failure to complete the project by the contracted deadline and put Lindeman on formal notice that he had approximately one month to cure the default under the Construction Contract.[32]  Absent a cure of the default, Nooruddin indicated that he would pursue claims against him/Pinnacle pursuant to the Texas Business and Commercial Code, and pursue claims for fraud and for violations of the Texas Property Code.[33]

Thereafter, Nooruddin hired counsel and on February 11, 2019, after Lindeman had failed to cure the default, Nooruddin's counsel, Zak Presley, sent Lindeman a Notice of Termination on behalf of Nooruddin (the "**Termination Notice**") to exercise Nooruddin's right to terminate the Construction Contract, effective immediately.[34]  The Termination Notice also demanded that Lindeman provide a full accounting of the "direct and indirect costs charged to [Nooruddin] for the Project . . . [and] documentation supporting all deposits and disbursements made by Pinnacle in connection with the Project including all invoices and other supporting documentation."[35] Additionally, the Termination Notice demanded that Pinnacle produce (1) "executed unconditional lien waivers from all subcontractors and suppliers retained by Pinnacle in connection with the Project and an Unconditional Lien Waiver and Release from Pinnacle;" and (2) "an executed notarized All Bills Paid Affidavit confirming under oath that all subcontractors, suppliers, or persons/companies who have furnished materials and/or labor to the Property under Pinnacle have been paid in full."[36]  Furthermore, upon the completion of accounting, the letter informed

---

[31] *See* Pl.'s Exh. 9.

[32] *Id.*

[33] *Id.*

[34] *See* Pl.'s Exh. 10.

[35] *See id.*

[36] *See id.*

Lindeman of Nooruddin's intent to present a demand upon Pinnacle to resolve the matter without litigation.[37]

### C.      *Nooruddin Funds the Completion of the Renovations*

As of the date of termination of the Construction Contact, a majority of the work contracted for had either not been completed, had only partially been completed, or had to be redone due to substandard and below market conditions.   The status of the project as of such time can be summarized as follows:

Work Not Completed
- A new HVAC was not installed.
- Gutters were not installed.
- The damaged wood on the house and garage was not fixed.
- No landscaping or sod had been installed in the front or backyard.
- The flowerbeds were not trimmed or mulched.
- There was no shed to be demolished.
- Bathrooms were not rehabilitated.
- No tile was installed in the laundry room.
- Hardwood flooring was not installed in the bedrooms.
- Wall outlets were not replaced.
- There was no trim on the panel doors.
- No new toilets in the bathrooms.
- The 1/16" title was not installed.
- New kitchen cabinets, hardware, and countertops were not installed.
- No new backsplash in the kitchen.
- New sink, gooseneck facet, and disposal were not installed.

Work Partially Completed
- Flat surface paint was incomplete.
- The floors were partially demolished.
- The light fixtures had been taken down but had not been replaced.
- Tiles were partially installed in two bathrooms.
- Only five out of the ten windows had been replaced.

Work to be Redone
- The plumbing was partially completed but had to be redone since it was not up to code.
- Electrical work had to be redone.
- The exterior paint had to be redone.

---

[37] *See id.*

As a result of Lindeman's failure to complete the renovations at the Property, Nooruddin consulted with various construction-related companies and received quotes regarding how much it would cost to fix and complete the work.[38]  Ultimately, Nooruddin hired Appliant, LLC ("**Appliant**") for "[c]ompletion of the house renovation left unfinished by the previous contractor."[39]  The contract was executed on February 21, 2019.[40]  Nooruddin agreed to pay Appliant according to the work performed and reported during the week.[41]  In total, Nooruddin paid Appliant $24,030 to complete those renovations assigned to Appliant.[42]

However, Appliant was not the only contractor Nooruddin had to hire to finish or fix the renovations.  Among the additional expenses incurred, Nooruddin paid $4,641.66 to Garza Roofing & Remodeling to fix damage to the Property;[43] an additional $1,000 to Texas Haulers to have a dumpster, left by Lindeman, removed from the Property;[44] an additional $5,000 to undo substandard work performed by Lindeman; and an additional $15,596.32 in out of pocket expenses for materials and supplies purchased from Home Depot and Lowe's Home Improvement for the completion of the contracted-for work.[45]

### D.    *Lindeman Files for Bankruptcy Protection*

Facing the debt owed to Nooruddin and others, Lindeman (along with his wife) determined to seek bankruptcy protection.  Accordingly, on February 28, 2019, the Debtors filed a joint

---

[38] *See* Pl.'s Exhs. 12A-G.

[39] *See* Pl.'s Exh. 13.

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See* Pl.'s Exh. 15.

[44] *See* Pl.'s Exh. 14.

[45] *See* Pl.'s Exh. 13.

voluntary petition for relief under chapter 7 of the Bankruptcy Code, thereby initiating the Bankruptcy Case.[46]

Quickly after creditors were put on notice of the Bankruptcy Case, creditors began to initiate litigation against Lindeman to object to his discharge, many having the same types of stories as Nooruddin.  Eventually, the United States Trustee filed suit to object to the Debtors' discharge under section 727 of the Bankruptcy Code, alleging that the Debtors had knowingly and fraudulently made a false oath or account in connection with the Bankruptcy Case, concealed and transferred property, failed to keep and preserve books and records from which the Debtors' business transactions and financial condition may be ascertained, and failed to explain loss or deficiency of assets.[47]  Ultimately, the Court sustained the objection and denied the Debtors a discharge.[48]

### DISCUSSION

As previously indicated, Nooruddin asserts that Lindeman misused construction trust funds in violation of the Texas Deceptive Trade Practices Act, committed common law fraud, embezzled construction trust funds, and breached his fiduciary duty to Nooruddin.  The Court will address each cause of action in turn.

### A.      Misuse of Construction Trust Funds – DTPA Claims

Nooruddin contends that Lindeman misused construction trust funds and has thus violated certain provisions of the Deceptive Trade Practices Act ("**DTPA**").[49]  The DTPA is construed liberally to "protect consumers against false, misleading, and deceptive business practices,

---

[46] *See* Bankruptcy Case Docket No. 1.

[47] *See* Adversary Proceeding No. 19-4103, Docket No. 1.

[48] *See* Adversary Proceeding No. 19-4103, Docket No. 54.

[49] TEX. BUS. & COMM. CODE § 17.01, et seq.

unconscionable actions and breaches of warranty and to provide efficient and economical procedures to secure such protection."[50]  The DTPA functions to allow consumers to pursue causes of actions for deceptive trade practices without the burden of proof and defenses available in breach of contract or common law fraud cases.[51]

While there is not an exhaustive list of "false, misleading, or deceptive acts or practices," section 17.46(b) provides numerous examples of such practices.[52]  In relation to those examples, Nooruddin specifically contends that Lindeman represented that goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;[53] misrepresented that goods or services were of a particular standard, quality, or grade, or that goods were of a particular style or model, when they were of another;[54] misrepresented that work or services had been performed on, or parts replaced in, goods;[55] and failed to disclose information concerning goods or services which was known at the time of the transaction, and that the failure to disclose such information was intended to induce him to enter into the Construction Contract that he would not have entered into had the information been disclosed.[56]

To succeed under a DTPA claim, a plaintiff must establish that (i) he or she was a consumer; (ii) the defendant committed at least one wrongful act enumerated in § 17.46(b) of the Texas Business & Commerce Code; and (iii) the defendant's actions were a cause of the plaintiff's

---

[50] *Smith v. Baldwin*, 611 S.W.2d 611, 614 (Tex. 1980).

[51] *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex. 2012).

[52] TEX. BUS. & COMM. CODE § 17.46(b).

[53] TEX. BUS. & COMM. CODE § 17.46(b)(5).

[54] TEX. BUS. & COMM. CODE § 17.46(b)(7).

[55] TEX. BUS. & COMM. CODE § 17.46(b)(22).

[56] TEX. BUS. & COMM. CODE § 17.46(b)(24).

economic damages.[57]   Further, economic damages are recoverable if the defendant used a false, misleading, or deceptive trade act or practice that is enumerated in a subdivision of Subsection (b) of Section 17.46 and relied on by the plaintiff consumer to the plaintiff consumer's detriment.[58]

### 1.   *Nooruddin is a Consumer as Defined Under the DTPA*

First, the Court must determine if Nooruddin was a consumer as defined by the DTPA. The DTPA defines a "consumer" as "an individual . . . who seeks or acquires by purchase or lease, any goods or services . . . ."[59]   Service is defined as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods."[60]   The objective of a transaction must be examined from the perspective of the plaintiff.[61]

While a contractual relationship is not necessarily determinative, in this case, it is clear that Nooruddin hired Lindeman with the intention to retain his services to remodel the Property and to gain knowledge of the home renovation business.[62]   Specifically, Nooruddin sought Lindeman to perform renovations intended to bring the Property in line with current market standards and, additionally, to provide Nooruddin with exposure to the remodeling business for potential future ventures of his own.   As such, the Court concludes that Nooruddin was a consumer under the DTPA.

---

[57] *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *see also Sevadjian, et al. v. Dcuntov Motor Co., LLC* (*In re Dcuntov Motor Co., LLC*), No. 21-40348-MXM, 2023 WL 8252914, at *16 (Bankr. N.D. Tex. Nov. 28, 2023).

[58] Tex. Bus. & Comm. Code § 17.50(a).

[59] Tex. Bus. & Comm. Code § 17.45(4).

[60] Tex. Bus. & Comm. Code § 17.45(1)-(2).

[61] *Farooqi v. Carroll* (*In re Carroll*), 464 B.R. 293, 324 (Bankr. N.D. Tex. 2011) (referencing *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex.1983)).

[62] *Id.* at 325.

### 2.    *Lindeman Violated Provisions of the DTPA*

Next, to establish a claim pursuant to the DTPA, Lindeman must have violated a provision enumerated in subsection (b) of Section 17.46.  Section 17.46(a) of the DTPA provides that "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division."[63]  Subsection (b) goes on to define specific acts as "false, misleading, or deceptive" including, among other things, representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have,[64] representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another,[65] representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced,[66] and failed to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.[67]  Each subsection alleged by Nooruddin will be discussed in turn below.

### (a) Tex. Bus. & Comm. Code § 17.46(b)(5)

Section 17.46(b)(5) defines "false, misleading, or deceptive" to include representing that goods or services have characteristics, ingredients, uses, benefits, or quantities which they do not

---

[63] TEX. BUS. & COMM. CODE § 17.46(a).

[64] TEX. BUS. & COMM. CODE § 17.46(b)(5).

[65] TEX. BUS. & COMM. CODE § 17.46(b)(7).

[66] TEX. BUS. & COMM. CODE § 17.46(b)(22).

[67] TEX. BUS. & COMM. CODE § 17.46(b)(24).

have.[68]   One purpose of the subsection is to ensure that the descriptions of goods and services offered are accurate.[69]

Nooruddin has failed to show or demonstrate that the description of the services to be provided did not possess the characteristics, ingredients, uses, benefits, or quantities.  Based on the evidence, the Court finds that Lindeman did not misrepresent a service that he was contracted to perform.

Accordingly, Nooruddin has failed to establish he is entitled to damages under § 17.46(b)(5) of the DTPA.

*(b) Tex. Bus. & Comm. Code § 17.46(b)(7)*

Section 17.46(b)(7) sets forth another of the specific acts defined as "false, misleading, or deceptive" – specifically, "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."[70]

Here, Lindeman represented and agreed that he would complete renovations that would bring the Property up to "current market standards" within an eight-week time period.  In reality, Nooruddin had to hire different contractors to fix the work completed by Lindeman.  Specifically, among other things, the paint was already peeling, light switches were installed unevenly, and laminate flooring was installed as opposed to the agreed upon hardwood flooring.  Moreover, the Construction Contract provided that the renovations would be completed within an eight-week period.  Nooruddin made numerous visits to the Property and saw that no one was on site working.  When Nooruddin raised the issue by text message, Lindeman attributed the lack of workers to

---

[68] Tex. Bus. & Comm. Code § 17.46(b)(5).

[69] *Id.*

[70] Tex. Bus. & Comm. Code § 17.46(b)(7).

weather conditions or lunch breaks.  As such, Lindeman's renovation services did not meet the standard of quality as represented in the Construction Contract.

Based upon the foregoing, Nooruddin has established he is entitled to recovery under § 17.46(b)(7) of the DTPA.

*(c) Tex. Bus. & Comm. Code § 17.46(b)(22)*

Section 17.46(b)(22) is violated when a seller represents that "work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the services replaced."[71]

In this case, Lindeman made several representations on the draw requests indicating that work had been performed at the Property.  To Nooruddin's surprise, when he visited the Property, the work Lindeman claimed to have performed had not been performed.  Instead, Nooruddin had to hire other contractors to perform the work.  Specifically, when requesting the draws, Lindeman stated that he had completed interior electrical work, sheetrock installation, plumbing, vanity installation, gutter removal, full-house rewiring, HVAC work, and obtained nine dumpsters. Additionally, he repeated that he had performed electrical and plumbing work on three of the draw requests.[72]  In reality, a new HVAC was not installed, gutters were not installed, and the electrical and plumbing work was not completed or had to be redone to meet code standards.

Accordingly, Nooruddin has also established he is entitled to recovery under § 17.46(b)(22) of the DTPA.

---

[71] TEX. BUS. & COMM. CODE § 17.46(b)(22).

[72] *See* Pl.'s Exh. 6.

*(d) Tex. Bus. & Comm. Code § 17.46(b)(24)*

Section 17.46(b)(24) provides that "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed" is a violation of the DTPA.[73]  This section specifically requires a failure to disclose.[74]   A mere non-disclosure is not enough to establish a claim, the non-disclosure must be intended to induce the purchase.[75]  Based on the evidence at trial, Nooruddin failed to establish that there was a failure to disclose at the time of contract formation.  Rather, Lindeman misrepresented certain aspects of the renovation's progress after the agreement had been entered into and in connection with the draw requests.  Thus, while this gives rise to claims under other subsections of the DTPA, it does not present a claim under § 17.46(b)(24).

Accordingly, Nooruddin has failed to substantiate a claim under § 17.46(b)(24).

### 3.       *Lindeman's Violations Caused Noorudin Economic Damages*

Next, Nooruddin must establish he is entitled to economic damages for Lindeman's DTPA violations.  To recover economic damages under the DTPA, the defendant's action or actions must have been the producing cause of economic damages to the consumer.[76]   A producing cause of injury is an efficient, exciting, or contributing cause that in the natural sequence of events produces injuries or damages.[77]  The DTPA requires that the act causing injury be both a substantial factor

---

[73] TEX. BUS. & COMM. CODE § 17.46(b)(24).

[74] *English v. Aramark Corp.*, No. 19-20412, 2021 WL 4804570, at *3 (5th Cir. Oct. 14, 2021).

[75] *Guijarro v. Enterprise Holdings, Inc.*, No. 1:19-CV-217, 2020 WL 10229102, *6 (S.D. Tex. Aug. 5, 2020).

[76] TEX. BUS. & COMM. CODE § 17.50.

[77] *Farooqi v. Carroll* (*In re Carroll*), 464 B.R. 293, 329 (Bankr. N.D. Tex. 2011).

and a cause in fact of the injuries.[78]  This requires evidence that the consumer was adversely affected by the defendant's conduct, without which the injury would not have occurred.[79]

Based upon the evidence at trial, the Court finds that Lindeman's misrepresentation about what work performed and about the quality of the work actually performed were a producing cause of damage to Nooruddin, in that these misrepresentations were both a substantial factor and cause in fact of Nooruddin's damages.  Specifically, but for Lindeman's false assertions in the draw requests and the false assertions about the progress being made on the project, construction loan proceeds would not have been distributed and, thus, Nooruddin would not have lost those funds, had to hire different construction-related contractors, and had to incur additional expenses to finish the renovations.

### 4.     *Nooruddin is Entitled to Recover for the DTPA Violations*

Finally, the Court must determine the damages that are recoverable on account of Nooruddin's claim.  Under the DTPA, a consumer who prevails at trial may obtain, among other things, the amount of economic damages founds by the trier of fact.[80]  "Economic damages" are defined as "compensatory damages for pecuniary loss, including costs of repair and replacement."[81]

With the foregoing in mind, Nooruddin has presented evidence of the following damages: (i) $3,800 for a new HVAC system; (ii) $5,000 to fix the electrical; (iii) $15,000 for landscaping; (iv) $3,000 for light fixtures; (v) $24,030 to Appliant; (vi) $4,641.66 to Garza Roofing & Remodeling; and (vii) $15,596.32 for construction-related purchases made at Home Depot and

---

[78] *Id.*

[79] *McLeod v. Gyr*, 439 S.W.3d 639, 649 (Tex.App.—Dallas 2014, pet. denied).

[80] *See* TEX. BUS. & COMM. CODE § 17.50(b)(1).

[81] TEX. BUS. & COMM. CODE § 17.45(11).

Lowe's Home Improvement.  The Court finds such damages to be awardable under the DTPA, and notes that it is without taking into account the additional amounts spent by Nooruddin on tile and to complete the hardwood floors, for which insufficient evidence of cost was presented.

Accordingly, the Court finds that Nooruddin is entitled to economic damages in the amount of $71,067.98 against Lindeman for Lindeman's violation of the Texas DTPA.[82]

## B.      *Common Law Fraud*

Nooruddin asserts that Lindeman misused construction trust funds and thus, committed common law fraud.  The elements of common law fraud under Texas law are: (1) that a material representation was made by the defending party; (2) the representation was false; (3) when the representation was made, the defending party knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the defending party made the representation with the intent that the claimant should act upon it; (5) the claimant acted in reliance on the representation; and (6) the claimant thereby suffered injury.[83]

It is important to note that several of the representations complained of by Nooruddin are included as terms of the Construction Contract with Lindeman, specifically detailed in the scope of work.  As a general rule, the failure to perform the terms of a contract would give rise to a

---

[82] Pursuant to § 17.50(b)(1) of the DTPA, under specific circumstances, additional damages of up to three times the amount of the economic damages for mental anguish.  In this case, however, no or insufficient evidence of any such mental anguish was presented by Nooruddin.  Therefore, the Court will not discuss further the conditions under which such additional damages may be awarded.

[83] *Saenz v. Gomez*, 899 F.3d 384, 391 (5th Cir. 2018) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)); see also *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, L.L.C., 546 S.W.3d 648, 653 (Tex. 2018).

breach of contract claim.[84]   However, a contractual promise may be actionable as fraud if the contractual promise was made with the intent not to perform.[85]

Nooruddin asserts that Lindeman made several false representations with deceptive intent to receive more draws from the construction loan.  Among them, Nooruddin claims that Lindeman misrepresented the progress and timeline in which the renovations could be completed.  The Court does not find that the evidence shows that these representations were a promise of future performance with the intent not to perform.  There is no evidence that substantiates the contention that Lindeman agreed to provide these services with the intent not to perform.

Nooruddin further contends, however, that Lindeman misrepresented the work performed with each of the draw requests to receive the loan proceeds for his own, personal projects.  Specifically, Lindeman asserted that he had performed the plumbing work, replaced the HVAC system, installed the interior electrical, rewired the entire house, removed gutters, installed vanities, obtained nine dumpsters, and installed new windows.[86]   In reality, the work was never completed or had to be replaced due to its poor quality.  As the contractor for the renovations, Lindeman would be aware of the work performed.  As such, Lindeman knowingly misrepresented the work performed at the Property, listing items as completed when they were not.  These misrepresentations were made to induce Nooruddin to continue the authorization in place for funding of the draws from the construction loan.  Nooruddin relied on the misrepresented facts, as did American National, in honoring the draw requests.  Only later was Nooruddin left to put the

---

[84] *Tomlinson v. Clem* (*In re Clem*), 583 B.R. 329, 373 (Bankr. N.D. Tex. 2017).

[85] *Id.*; *see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act.").

[86] *See* Pl.'s Exh. 6.

pieces together and spend additional money to finish or fix the work that had already allegedly been performed.

While there is no evidence to substantiate the claim that Lindeman used the funds from the draw requests on projects other than the Property, Nooruddin is not required to prove the funds' whereabouts to prevail on a claim for common law fraud – just that the funds were used by Lindeman for something other than the Property. Nooruddin met that burden. As such, the claim for common law fraud is actionable. Next, the Court discusses Nooruddin's potential recovery pursuant to the claim for common law fraud.

Texas recognizes two measures for damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure.[87]  Out-of-pocket damages are measured by the difference between the value expended versus the value received, allowing recovery based on the actual injury suffered.[88]  Benefit-of-the-bargain damages are measured by the difference between the value represented and the value received, allowing recovery of profits that would have been made had the bargain been performed as promised.[89]

In this case, Nooruddin's damages are recoverable under the out-of-pocket theory based on the additional funds expended to complete the renovations at the Property. Accordingly, the Court finds that Nooruddin is entitled to damages in the amount of $71,067.98 against Lindeman on account of Lindeman's fraudulent actions. Noting that such damages are duplicative of the DTPA damages discussed above, while Nooruddin is only entitled to a single recovery for his damages, he is nevertheless entitled to the determination that such damages are proper under both his DTPA claim and his common law fraud claim.

---

[87] *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015).

[88] *Id.*

[89] *Id.*

### C.      Civil Claim for Embezzlement

Embezzlement is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into hands it has lawfully come."[90]  There must be proof of the defendant's fraudulent intent in taking the property.[91]

In this regard, Nooruddin predicates his embezzlement claim on the assertion that Lindeman used the drawn loan proceeds for other projects. However, Nooruddin candidly concedes in the Complaint that he has no proof of that,[92] and no evidence otherwise was admitted at trial.

Therefore, based upon the way in which the embezzlement claim was presented, the Court finds that Nooruddin has failed to carry his burden of proof on the embezzlement claim and it will be denied.

### D.      Breach of Fiduciary Duty in Relation to Construction Trust Funds

Nooruddin contends that Lindeman breached his fiduciary obligations to Nooruddin by fraudulently mishandling construction funds in violation of chapter 162 of the Texas Property Code, commonly known as the Texas Trust Fund Act.[93]

Under the Trust Fund Act, a trustee of funds is liable for misapplication of trust funds if he intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiary of the trust funds.[94] Construction payments constitute

---

[90] *Miller v. J.D. Abrams Inc.* (*In re Miller*), 156 F.3d 598, 602 (5th Cir. 1998) (citing *Greyhound Lines, Inc v. Thurston* (*In re Thurston*), 18 B.R. 545, 550 (Bankr. M.D. Ga. 1982)).

[91] *Id.* at 602-603.

[92] *See* Complaint, p. 5.

[93] TEX. PROP. CODE § 162.

[94] TEX. PROP. CODE § 162.031(a).

"trust funds" and are defined as payments made to a contractor or subcontractor under a construction contract for the improvement of specific real property.[95]    The contractor, subcontractor, or officer who receives the trust funds is considered a trustee of the funds.[96] Originally, the Act defined the statutory beneficiaries of the trust funds as "artisans, laborers, mechanics, contractors, subcontractors, and materialmen who labor or furnish labor or materials for the construction or repair of an improvement."[97]    However, in 2009, the Act extended the statutory definition of beneficiary to protect property owners.[98]    Now, under the Act, a beneficiary includes "a property owner . . . in connection with a residential construction contract."[99]

Texas courts have found that a trustee who "intentionally or knowingly or with the intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust fund" may be civilly liable to trust fund beneficiaries whom the Act was designed to protect.[100]    The Act provides that property owners are entitled to protection from a contractor's misapplication of trust funds related to a residential construction contract.

In this case, Lindeman agreed to the specific renovations as described in the scope of work at Nooruddin's Property.    In return, Nooruddin paid Lindeman $80,000 pursuant to the Construction Contract.  It is undisputed that these funds were disbursed to Lindeman.  It is equally clear from the evidence that Lindeman failed to use much of the funds for work on the Property

---

[95] TEX. PROP. CODE § 162.001(a).

[96] TEX. PROP. CODE § 162.002.

[97] *WeKnow Techs., Inc. v. Hayes*, No. 05-17-00554-CV, 2018 WL 3359085, *3 (Tex.App. —Dallas Jul. 20, 2018, no pet.); *see* Act of May 15, 1967, 60th Leg., R.S., ch. 323, § 1, 1967 Tex. Gen. Laws 770, 770.

[98] *Id.*

[99] TEX. PROP. CODE § 162.003(b).

[100] *Dealers Elec. Supply Co. v. Scroggins Const. Co., Inc.*, 292 S.W.3d 650, 657 (Tex. 2009).

and failed to return any of the funds to Nooruddin, thereby establishing that Lindeman diverted certain of these construction trust funds for his own benefit.

Because the Act is a remedial statute, courts have given it a broad construction to effectuate its protective purposes.[101]   The Court concludes (i) that the initial down payment made by Nooruddin along with the construction loan draws thereafter paid by American National to Lindeman were construction trust funds, (ii) that Lindeman held such funds in trust for the purposes of the construction project, (iii) that Nooruddin was a beneficiary of the trust funds, (iv) that Lindeman breached his fiduciary duty to Nooruddin in using certain of the funds for purposes other than the Property's renovation, and (v) that Nooruddin suffered the type of injury that the Texas Trust Fund Act seeks to prohibit – specifically, damages in the amount of $71,067.98, at outlined above.[102]

Accordingly, the Court finds that Nooruddin is entitled to damages in the amount of $71,067.98 against Lindeman for Lindeman's breach of fiduciary duty in violation of the Texas Trust Fund Act.  Noting against that such damages are duplicative of both the DTPA and common law fraud damages discussed above, while Nooruddin is only entitled to a single recovery for his damages, he is nevertheless entitled to the determination that such damages are proper under his DTPA claim, his common law fraud claim, and his Texas Trust Fund Act claim.

## *CONCLUSION*

For all of the foregoing reasons, the Court finds that the amount of the debt owed by Lindeman to Nooruddin that is not subject to a chapter 7 discharge pursuant to 11 U.S.C. § 727 is

---

[101] *WeKnow Techs., Inc.*, 2018 WL 3359085, at *4.

[102] TEX. PROP. CODE § 162.031; *Hartman v. Norman*, No. 09–16–00333–CV, 2017 WL 4682173, at *5 (Tex.App. — Beaumont Oct. 19, 2017, pet. denied) (finding that as a beneficiary under the Act, the property owner had an interest in ensuring that the contractor was utilizing the trust funds for the construction contract).

$71,067.98 based upon Lindeman's liability to Nooruddin for violation of the Texas DTPA, common law fraud, and violation of the Texas Trust Fund Act, as detailed above.  The Court will separately enter a final judgment in conformity herewith.

# # #   END OF MEMORANDUM OPINION   # # #